IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **SIERRA LAVONNE MCDONALD**, | Case No. 3:18-cv-01872-IM |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **DR. STEVE SHELTON, DR. ROBERT SNIDER, VASHAMY BRADY**, **JOHN DOES 1–10,** | |
| Defendants. | |

Kenneth I. Patterson, 405 W Arlington Street, Gladstone, OR 97027. Attorney for Plaintiff.

Robert E. Sullivan & Kenneth C. Crowley, Oregon Department of Justice Trial Division, 1162 Court Street NE, Salem, OR 97301. Attorneys for Defendants.

**IMMERGUT, District Judge.**

Plaintiff Sierra Lavonne McDonald[1] filed a constitutional claim, a claim under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and a claim under Section 504 the Rehabilitation Act of 1973, 29 U.S.C. § 794, against various medical staff at the Coffee Creek Correctional Facility ("CCCF"), where she was previously incarcerated. ECF 1 at ¶¶ 20–35. Plaintiff alleges Defendants Shelton, Snider, and Brady violated the Eighth Amendment, the ADA, and the Rehabilitation Act when they failed to provide her with adequate medical treatment for her ulcerative colitis and Crohn's disease.[2] *See generally* ECF 1.

This matter comes before the Court on Defendant Snider's Motion for Summary Judgment. ECF 66. The Court held a hearing on September 10, 2021, at which Plaintiff conceded her ADA and Rehabilitation Act claims and the Court took Plaintiff's Eighth Amendment Claim under advisement. *See* ECF 76.

In the instant Motion, Defendant seeks summary judgment in his favor on all of Plaintiff's claims on the grounds that (1) Plaintiff's claims under the ADA and Rehabilitation Act are time barred or, in the alternative, that Plaintiff has not established a violation the ADA or Rehabilitation Act and (2) Plaintiff has not established Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment or, in the alternative, that Defendant is entitled to qualified immunity. ECF 66 at 7–13. In her response, Plaintiff does not address Defendant's arguments relating to Plaintiff's ADA and Rehabilitation Act claims.

---

[1] Plaintiff is now known as Sierra Lavonne Ameon. *See* ECF 65, Joint Statement of Agreed Facts ("JSAF"), at ¶ 1.

[2] Vashamy Brady was dismissed from this action on June 18, 2019. ECF 30. Dr. Steven Shelton was dismissed from this action on December 10, 2020. ECF 53. Dr. Robert Snider ("Defendant") is the sole remaining defendant in this action.

PAGE 2 – OPINION AND ORDER

Plaintiff asserts that disputed issues of material fact require denial of Defendant's Motion as to Plaintiff's Eighth Amendment claim. ECF 73 at 5–9.

As noted, Plaintiff conceded her ADA and Rehabilitation Act claims at oral argument. The Court, therefore, finds that Plaintiff has not established that Defendant violated the ADA or the Rehabilitation Act. The Court also finds that Plaintiff fails to establish that disputed issues of material fact preclude summary judgment on her Eighth Amendment claim. The Court, therefore, GRANTS Defendant's Motion for Summary Judgment.

## BACKGROUND

The following facts are taken from Plaintiff's Complaint and the parties' materials related to Defendant's Motion for Summary Judgment and are viewed in the light most favorable to Plaintiff, the non-movant. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

From July 12, 2016 through June 30, 2017, Plaintiff was an inmate at CCCF, a prison operated by the Oregon Department of Corrections ("ODOC"). ECF 65, JSAF, at ¶ 1.

At some point before she was incarcerated at CCCF, Plaintiff was prescribed Remicade to treat her ulcerative colitis and Crohn's disease.[3] *Id.* at ¶ 2; ECF 1 at ¶¶ 8, 11. On May 17, 2016, Dr. Edward Schultheiss, M.D., a gastroenterologist with Salem Gastroenterology Consultants, recommended Plaintiff receive Remicade infusions every six weeks "and, after improvement, every eight weeks." EFC 65, JSAF, at ¶ 2.

On July 13, 2016, Plaintiff underwent an intake examination and physical at ODOC during which she reported that she received Remicade infusions every six weeks and that her last infusion occurred on June 24, 2016. *Id.* at ¶ 3. Later on the same day, July 13, 2016, Plaintiff

---

[3] The parties did not submit Plaintiff's medical record.

presented at ODOC Health Services and reported having bloody stools, nausea, and abdominal pain. Plaintiff was admitted to the infirmary for observation. *Id*. at ¶ 4.

On July 14, 2016, Plaintiff was seen by "a provider" and admitted to the infirmary. The provider ordered lab work, an EKG, X-rays, stool guaiac tests, and a urinalysis. *Id.* at ¶ 5. Nurses attempted to observe whether Plaintiff had blood in her stool, but Plaintiff was "uncooperative with collection or visual attempts." *Id*. at ¶ 6. A two-view abdomen X-ray showed a moderately large amount of stool in Plaintiff's right and left colon, but was otherwise unremarkable. The labs were inconsistent with acute inflammatory bowel disease ("IBD") exacerbation. The urinalysis was unremarkable. The EKG was normal. *Id*.

On July 15, 2016, Plaintiff was discharged from the infirmary, scheduled to follow up with a provider, and instructed to conduct a stool guaiac test three times per day. *Id*. at ¶ 7.

On July 18, 2016, the ODOC Therapeutic Level of Care ("TLC") Committee approved Remicade infusions for Plaintiff. ODOC, however, needed to receive Plaintiff's medical records to prescribe the appropriate Remicade dosage. *Id*. at ¶ 8.

At some point ODOC received Plaintiff's medical records and on July 29, 2016, "a provider ordered Remicade infusions." *Id*. at ¶ 10.

On August 2, 2016, "a provider" called Salem Gastroenterology Consultants to confirm Plaintiff's recommended dosage of Remicade. *Id*. at ¶ 11. Dr. Schultheiss recommended Plaintiff receive "10mg/kg every six weeks and then taper to 5 mg/kg if [Plaintiff] was disease stable." *Id*.

On August 3, 2016, a provider ordered Remicade infusions for Plaintiff. *Id*. at ¶ 12.

On August 4, 2016, the TLC Committee approved Remicade for Plaintiff as well as a gastrointestinal consultation with Dr. Schultheiss "to determine the proper taper of Remicade." *Id*. at ¶ 13.

On August 9, 2016, Plaintiff was seen by a provider and informed that she had a Remicade infusion scheduled for August 12, 2016. *Id*. at ¶ 14.

On August 11, 2016, Plaintiff was seen by Health Services with complaints of abdominal cramping. Plaintiff was advised to drink more water and to notify Health Services "every time she had a bowel movement so a nurse could check for blood in her stools." *Id*. at ¶ 15.

On August 12, 2016, Plaintiff received a Remicade infusion.[4] *Id*. at ¶ 16.

On August 15, 2016, Plaintiff reported to Health Services and complained of an allergic reaction to the Remicade. "No reaction was noted." *Id.* at ¶ 17.

On August 18, 2016, the TLC Committee approved a follow-up gastrointestinal consultation with Dr. Schultheiss and noted it had previously approved that request on August 4, 2016. *Id*. at ¶¶ 13, 18. The same day, Plaintiff reported to Health Services with complaints of nausea, diarrhea, and abdominal pain. Plaintiff was advised to notify Health Services after she had "bowel movements so a nurse could visualize whether she had bloody stools." *Id*. at ¶ 19.

On August 31, 2016, Defendant examined Plaintiff. Defendant discussed with Plaintiff Remicade infusions, Crohn's disease, and IBD. "The plan of care was to determine the next Remicade dose after [Plaintiff] had her . . . gastrointestinal consultation" with Dr. Schultheiss.[5] *Id*. at ¶ 20. That evening, Health Services "responded to Plaintiff's complaints of abdominal pain." *Id*. at ¶ 21. Plaintiff requested to be sent to the Emergency Department, but "she refused to answer medical questions." *Id*.

---

[4] Six weeks after August 12, 2016, was September 23, 2016.

[5] Although it is not entirely clear on this record, it does not appear that a consultation with Dr. Schultheiss had been scheduled at the time of Plaintiff's August 31, 2016, examination by Defendant.

PAGE 5 – OPINION AND ORDER

In early September 2016, Plaintiff reported to Health Services "complaining of a gastrointestinal flare." *Id.* at ¶ 22.

On September 19, 2016, Defendant examined Plaintiff and advised Plaintiff that he was waiting for a gastrointestinal consultation with Dr. Schultheiss to help determine Plaintiff's next scheduled dose of Remicade.[6] Plaintiff reported that she was "still having abdominal pain but that her current flare was resolved. [Defendant] ordered lab work." *Id.* at ¶ 23.

On September 28, 2016, Defendant examined Plaintiff. Plaintiff inquired about her next Remicade infusion and Defendant again advised her that he was waiting for a gastrointestinal consultation "to help determine [Plaintiff's] next scheduled dose. [Defendant] asked that Health Services ensure the appointment [for Plaintiff's gastrointestinal consultation] was scheduled." *Id.* at ¶ 24.

On October 1 and 4, 2016, Plaintiff presented to Health Services and reported "a Crohn's flare." *Id.* at ¶ 25.

On October 10, 2016, "a scheduled appointment[7] with Salem Gastroenterology Consultants needed to be rescheduled due to a conflict with an emergent mental health evaluation for [Plaintiff]." *Id.* at ¶ 26. Plaintiff's appointment with Salem Gastroenterology Consultants was rescheduled for November 1, 2016. *Id.*

On October 13, 2016, Plaintiff reported to Health Services for a medical assessment. Plaintiff complained of stomach pain and frequent bowel movements with blood. *Id.* at ¶ 27.

---

[6] It does not appear that a consultation with Dr. Schultheiss had been scheduled at the time of Plaintiff's September 19, 2016 examination by Defendant.

[7] The record does not reflect the date on which Plaintiff was to have had an appointment with Salem Gastroenterology Consultants.

PAGE 6 – OPINION AND ORDER

Plaintiff's "appointment with [Defendant] for that day was cancelled but [Defendant] conducted a chart review on October 14." *Id*.

On October 15, 2016, Plaintiff reported to Health Services and complained of diarrhea. *Id*. at ¶ 28.

On October 19, 2016, Plaintiff again reported to Health Services and "complained of severe abdominal pain and a Crohn's flare." *Id.* at ¶ 29. Plaintiff was examined and advised to use a hot pack, to drink fluids, and to take her medications as prescribed. *Id*.

On October 20, 2016, Plaintiff again reported to Health Services and reported having blood in her stool. "A nurse observed a small amount of red in [Plaintiff's] stool." *Id*. at ¶ 30.

On Friday, October 21, 2016, Plaintiff failed to attend a scheduled Health Services appointment, but later that evening, "Health Services was called to assist" Plaintiff, who reported that she "could not walk to Health Services due to pain in her abdomen." *Id.* at ¶¶ 31, 32. Plaintiff "was able to ambulate down the stairs without difficulty." *Id*. at ¶ 32. Plaintiff was examined by Health Services where she "reported that she had diarrhea and was not drinking fluids." *Id*. Plaintiff had a "temperature of 102 degrees, which later increased to 103 degrees." *Id*. Plaintiff was given Tylenol, ibuprofen, and a pitcher of water, and "was placed under observation to monitor if [her] fever subsided." *Id*. At some point, Plaintiff "used the bathroom and reported bloody stool. A nurse visualized a small amount of blood in [Plaintiff's] stool." *Id*. at ¶ 33. The nurse directed Plaintiff "to hydrate and rest." *Id*. Plaintiff "was escorted back to her housing unit. The plan of care was to continue to assess [Plaintiff's] increased temperature in the next hour or two after she calmed down, for staff safety." *Id*. Staff took Plaintiff's temperature "a few hours later" and it was 98.1 degrees." *Id*. at ¶ 34. "A nurse put in a request for a provider to

conduct a chart review on Monday due to [Plaintiff's] increased temperature and reporting of symptoms." *Id*.

On Monday, October 24, 2016, Defendant conducted a chart review. Defendant ordered "a hot pack for [Plaintiff] three times per day for one week," for Plaintiff's "temperature and vital signs to be checked every shift," and "for labs to be taken." *Id*. at ¶ 35. Defendant also asked to be notified if Plaintiff's temperature rose above 99 degrees. *Id.*

At some point on October 24, 2016, Plaintiff reported "a Crohn's flare up with frequent diarrhea with blood" as well as abdominal pain and nausea. *Id*. at ¶ 36. "One episode of emesis (vomiting) was observed." *Id*. Plaintiff's temperature was 99.8 degrees. A nurse brought Plaintiff a hot pack as well as "a hat to collect stool." Plaintiff took the hot pack, but refused the hat. *Id*. at ¶ 37. Plaintiff "reported that she had been unable to drink water." *Id*. at ¶ 38. The nurse encouraged Plaintiff to try to increase her fluid intake and "attempted to draw labs [from Plaintiff] twice, without success." *Id*. The nurse "provided a report on [Plaintiff] to [Defendant]." *Id*.

On October 25, 2016, Plaintiff did not permit a nurse to check her vital signs or to draw her blood for lab work. *Id*. at ¶ 39. Plaintiff did permit the nurse to check her temperature, which was 98.6 degrees. *Id*. Later on October 25, 2016, "a nurse attempted to draw labs twice, without success." *Id*. at ¶ 40.

In the afternoon on October 25, 2016 Plaintiff was admitted to the infirmary with complaints of abdominal pain. *Id*. at ¶ 41. Plaintiff "was examined and her temperature read 99.0 degrees." *Id*. Defendant and a nurse both unsuccessfully attempted to draw blood from Plaintiff. Defendant ordered that Plaintiff receive intravenous fluids and that staff reattempt to draw her blood for lab work. *Id*. "Because [Plaintiff's] last Remicade infusion was on August 12, 2016

and [Plaintiff] missed her . . . gastroenterology appointment [in October], [Defendant] called Dr. Schultheiss to consult with him." *Id*. Dr. Schultheiss recommended Plaintiff receive Remicade infusions "every eight weeks, and possibly every six weeks." *Id*. Dr. Schultheiss also recommended prescribing Bentyl. *Id*. Defendant ordered staff to start Plaintiff on Bentyl and that Plaintiff be given Remicade after she was hydrated. Defendant also ordered "a strict stool count." *Id*. After several attempts, a nurse was successful at starting Plaintiff on an IV for intravenous fluids in the evening of October 25, 2016. *Id*. at ¶¶ 42–43. "Following the insertion of the IV, [Plaintiff] reported [having] multiple loose bloody stools." *Id*. at ¶ 44. Staff observed Plaintiff had "several non-loose stools with a small amount of blood." *Id*. Plaintiff vomited once and had a temperature of 99.7 degrees. Staff gave Plaintiff Tylenol and Zofran. *Id.*

On October 26, 2016, Plaintiff refused to use the stool collection hat and a nurse was unable to observe Plaintiff's bowel movements. Plaintiff "refused a medical assessment, breakfast, and her morning medications." *Id.* at ¶ 46. That same day, Defendant examined Plaintiff, who complained of lower abdominal pain; Plaintiff was "very resistant to complying with instructions for an examination." *Id*. at ¶ 47. Defendant was able to "press firmly and deeply into [Plaintiff's] abdomen without complaints of pain or discomfort." *Id*. Defendant discontinued Plaintiff's prescription for Bentyl "due to contraindications." *Id.* "The plan of care was to obtain lab work, continue further hydration via IV, and give [Plaintiff] a Remicade infusion." *Id*. Plaintiff was restarted on an IV for fluids. Plaintiff, however, refused to take her noon medications and "continued to be resistant to using a hat so nurses could observe her bowel movements." *Id.* at ¶ 48. In addition, nurses tried three times to draw blood for lab work, "but were unsuccessful." *Id*. By the afternoon, Plaintiff's temperature was 100.4 degrees. Staff

PAGE 9 – OPINION AND ORDER

encouraged Plaintiff to increase her fluid intake and offered Plaintiff Tylenol. Plaintiff refused Tylenol. *Id*.

On October 27, 2016, Plaintiff was examined by "a provider." *Id*. at ¶ 49. Plaintiff reported having increased watery stool and abdominal pain. Plaintiff's temperature was 103 degrees. Staff "had been unable to conduct lab work due to lack of venous access." *Id*. Plaintiff was transferred to the emergency department at Legacy Meridian Park for evaluation, *id*., where she "received lab work, underwent a two-view chest X-ray and a computerized tomography ('CT') scan of her abdomen and pelvis," and was examined by a gastroenterologist, Dr. Paul Anderson, *id*. at ¶ 50. Plaintiff was also given a Remicade infusion. Dr. Anderson recommended Plaintiff receive Remicade infusions on November 10, 2016, December 8, 2016, "and then every six weeks thereafter." *Id*.

On November 2, 2016, Plaintiff was discharged from Legacy Meridian Park. *Id*. at ¶ 51.

Remicade infusions were approved by the TLC Committee and ordered on November 10, 2016, December 8, 2016 "and every six weeks thereafter." *Id*. at ¶ 52. Plaintiff received "consultations with Salem Gastroenterology Consultants until her release from ODOC custody." *Id*. at ¶ 53.

## STANDARDS

### I.  Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards*, 251 F.3d at 1257.

Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the [non-movant's] position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

"The evidence presented by the parties must be admissible." *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1065 (C.D. Cal. 2002) (citing Fed. R. Civ. P. 56(e)). Further, the non-moving party may not rest on conclusory or speculative evidence but rather must "set forth specific facts in support of [its] . . . theory." *Thornhill Pub. Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## II.  Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages." *Wood v. Moss*, 572 U.S. 744, 757 (2014); *Krainski v. Nevada ex. Rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts. And reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (first quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982), then quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)) (alteration in original). "The privilege is an *immunity from*

PAGE 11 – OPINION AND ORDER

*suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (citation and internal quotation marks omitted) (emphasis in original). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Qualified immunity, however, is only an immunity from suit for damages; it is not an immunity from suit for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

## DISCUSSION

Plaintiff brings claims against Defendant for violation of the ADA, the Rehabilitation Act, and the Eighth Amendment. ECF 1. As noted, Defendant seeks summary judgment on all of Plaintiff's claims. ECF 66.

I.  **Plaintiff's ADA and Rehabilitation Act Claims**

In her ADA and Rehabilitation Act claims, Plaintiff alleges Defendant violated § 504 of the Rehabilitation Act and Title II of the ADA when he failed to provide her "with medication necessary to control her bowel inflammation, thus denying her the ability to function in the same or similar way as other inmates." ECF 1 at ¶ 31. Defendant asserts Plaintiff's ADA and Rehabilitation Act claims are time barred or, in the alternative, that Plaintiff has not established Defendant violated the ADA or Rehabilitation Act. ECF 66 at 10–12.

Plaintiff did not respond to Defendant's arguments in her Response to Defendant's Motion for Summary Judgment, and, at oral argument conceded her ADA claim. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's claims for violation of the ADA and Rehabilitation Act.

## II. Plaintiff's Eighth Amendment Claim

Plaintiff asserts Defendant was deliberately indifferent to her serious medical needs in violation of the Eighth Amendment when he failed to provide Plaintiff with a Remicade infusions from September 23, 2016 to October 27, 2016.

Defendant moves for summary judgment on Plaintiff's Eighth Amendment claim on the grounds that Plaintiff received adequate medical care to treat her conditions and her allegations "amount to a disagreement with her physician or a difference of opinion among physicians" rather than to a constitutional violation. ECF 66 at 6–9.

### A. Standards

Deliberate indifference to serious medical needs is a cognizable claim for violation of the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (same). To establish deliberate indifference:

> First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citations and internal quotation marks omitted)). To satisfy the second prong, a plaintiff must show there was "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm [was] caused by the indifference." *Id*. Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by . . . intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted); *see also Jett*, 439 F.3d at 1096 (explaining that deliberate indifference may

be established by showing that prison officials denied, delayed, or intentionally interfered with medical treatment or by the way prison officials provided medical care).

"Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citation and internal quotation marks omitted); *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." (citation and internal quotation marks omitted)). In addition, "a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." *Wilhelm*, 680 F.3d at 1122 (citation and internal quotation marks omitted). To prevail on an Eighth Amendment claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, and that they chose this course in conscious disregard of an excessive risk to the plaintiff's health. *Toguchi*, 391 F.3d at 1058.

### B.   Analysis

As noted, Plaintiff asserts Defendant was deliberately indifferent to her medical needs in violation of the Eighth Amendment when he failed to provide Plaintiff with a Remicade infusion from September 23, 2016, through October 27, 2016. *See* ECF 73 at 6–9; ECF 1 at ¶¶ 12–19. Defendant concedes Plaintiff had serious medical needs, but asserts Plaintiff received adequate medical care. *See* ECF 66 at 7–8. Specifically, Defendant contends Plaintiff was always given prompt access to care including evaluations and follow-ups with Health Services, treatment in the infirmary, and treatment at the hospital when appropriate. Defendant also asserts Plaintiff received appropriate care for her condition and the delays in Plaintiff's treatment were due to

Plaintiff's refusal to allow diagnostic treatment at times, her inability to attend a scheduled appointment due to an emergent mental health evaluation, and issues with medical staff obtaining necessary bloodwork. *See* ECF 68, Snider Decl., at ¶¶ 7–10, 12–13.

Plaintiff concedes she was treated by CCCF medical staff frequently, but points out that her treatment did not include a Remicade infusion, which, according to Plaintiff, was contrary to the advice of her treating gastroenterologist, Dr. Schultheiss. *See* ECF 73 at 5–8. Plaintiff contends there is at least a dispute of material fact as to whether Defendant's failure to provide her with a Remicade infusion from September 23, 2021, through October 27, 2021, constitutes deliberate indifference. *Id*.

Dr. Snider states in his Declaration that Plaintiff received appropriate treatment for her condition and any delays in Plaintiff's treatment "were due to [Plaintiff's] refusal of recommended diagnostic treatment, an inability to attend a scheduled appointment, and lack of venous access." ECF 68, Snider Decl., at ¶ 13. Dr. Snider explains "[i]t is critical to obtain lab work of patients on Remicade because Remicade has immune-suppressing properties. The side effects of Remicade include nausea, stomach pain, and flushing." *Id.* at ¶ 9. Dr. Snider further explains "[r]eceiving adequate treatment with Remicade, including dosage and frequency, is important because patients can develop antibodies to Remicade." *Id.* at ¶ 10. Plaintiff does not provide any medical expert testimony or medical evidence that contradicts Defendant's evidence that it was critical to obtain lab work in order to evaluate the effect of Remicade on Plaintiff's condition or that calibration of the dosage and frequency of Remicade treatment was critical. In addition, the record reflects Plaintiff reported to Health Services that she was having an allergic reaction to the Remicade after she received her August 12, 2016, Remicade infusion. ECF 65, JSAF, at ¶ 17. Although "no reaction was noted," *id.*, it is reasonable to infer that Plaintiff was

PAGE 15 – OPINION AND ORDER


experiencing issues that would indicate caution in the further administration of Remicade was warranted. In addition, although Plaintiff received her August Remicade infusion on the schedule recommended by Dr. Schultheiss, Plaintiff reported to Health Services at least three times between August 12, 2016, and September 23, 2016, complaining of nausea, diarrhea, abdominal pain, bloody stool, and gastrointestinal flares. *See id.* at ¶¶ 17, 19, 22. It is reasonable to infer from these facts together with Defendant's statements that Remicade has immune-suppressing properties and can cause side effects similar to the issues Plaintiff was reporting, that it was not unreasonable for Defendant and medical staff to wait to administer another dose of Remicade until after Defendant obtained relevant lab work and Plaintiff was seen by specialists at Salem Gastroenterology.

The record also reflects that at various times Plaintiff refused medication, medical assessments, to collect her stool, to permit medical staff to check her vital signs, to permit blood draws, to permit staff access to an IV site, and to permit staff to look at her stool. ECF 65, JSAF, at ¶¶ 35–50. Plaintiff does not point to any medical evidence that indicates it would have been reasonable for Defendant to administer Remicade under those circumstances. In addition, the record reflects Plaintiff was provided with other medication and treatment when she experienced symptoms. When Plaintiff's symptoms worsened and staff were unable to obtain necessary blood work, Plaintiff was taken to the hospital for treatment.

Although the Ninth Circuit has concluded plaintiffs have established genuine disputes of material fact existed so as to preclude summary judgment in some circumstances in which doctors ignored the advice of specialists and denied or delayed inmates' medical treatment, the circumstances of those cases are distinguishable. For example, in *Snow v. McDaniel*, the Ninth Circuit concluded the district court erred when it granted summary judgment in favor of the

defendants on the plaintiff's Eighth Amendment claim when the record reflected the defendants failed to provide the plaintiff with surgery to replace both of his hips for three years after multiple doctors recommended hip-replacement surgery. 681 F.3d 978, 982 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). In contrast, here, if there was delay due to Defendant's conduct, it was at most less than five weeks, assuming a six-week infusion schedule, and three weeks, assuming an eight-week schedule. In addition, unlike in *Snow,* there is no evidence in the record from which it could reasonably be inferred that Defendant chose not to administer Plaintiff a second Remicade infusion in conscious disregard of Plaintiff's health. In fact, as noted, the record reflects Plaintiff reported having an allergic reaction to Remicade and continued to experience serious symptoms after she received Remicade in August 2016. Moreover, there is no evidence that it would have been reasonable for Defendant to administer a Remicade infusion without first obtaining relevant blood work, which medical staff were not able to do on several occasions.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes a reasonable juror could not find on this record that Defendant was deliberately indifferent to Plaintiff's serious medical needs when he did not administer Plaintiff a Remicade infusion from September 23, 2016, through October 27, 2016.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's Eighth Amendment claim.[8]

---

[8] Having found that Defendant is entitled to summary judgment on Plaintiff's Eighth Amendment claim, the Court declines to address qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Snider's Motion for Summary Judgment, ECF 66.

**IT IS SO ORDERED**.

DATED this 15th day of September, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 18 – OPINION AND ORDER